[Cite as *Echemann v. Echemann*, 2016-Ohio-3212.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SHELBY COUNTY

THOMAS A. ECHEMANN,

    PETITIONER-APPELLEE,             CASE NO.  17-15-19

    v.

MARY PAT ECHEMANN,               O P I N I O N

    RESPONDENT-APPELLANT.

Appeal from Shelby County Common Pleas Court
Domestic Relations Division
Trial Court No. 15CV000064

Judgment Affirmed

Date of Decision:  May 31, 2016

APPEARANCES:

    *Jeremy M. Tomb* for Appellant

    *Thomas W. Kerrigan* for Appellee

**ROGERS, J**

{¶1} Respondent–Appellant, Mary Pat Echemann ("Mary Pat"), appeals the judgment of the Court of Common Pleas of Shelby County granting Petitioner–Appellee, Thomas Echemann ("Tom"), a civil stalking protection order ("CSPO") against her. On appeal, Mary Pat argues that the CSPO full hearing was improperly continued; the record contained insufficient evidence to support the issuance of the CSPO; the CSPO was against the manifest weight of the evidence; the trial court erred in failing to consider Tom's testimony at the ex parte hearing; and the trial court erred in relying on the magistrate's determinations as to the credibility of the witnesses. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On March 20, 2015, Tom filed a petition for a CSPO against Mary Pat, alleging that she had violated R.C. 2903.211, Ohio's menacing by stalking statute. That same day, an ex parte hearing was held and an ex parte CSPO was issued. A full hearing was set for April 1, 2015.

{¶3} On March 26, 2015, counsel for Mary Pat requested a continuance due to a scheduling conflict, and the full hearing was continued to May 5, 2015.

{¶4} On May 1, 2015, the magistrate continued the full hearing to July 13, 2015. It stated that "[d]ue to the number of potential witnesses, there is not sufficient time to hear the case on May 5, 2015." (Docket No. 19, p. 1).

**{¶5}** On July 13, 2015, the full hearing was held, and the following evidence was presented.[1]

**{¶6}** Chief Deputy Jim Frye of the Shelby County Sheriff's Department testified that on the evening of October 11, 2014, he and his wife were at The Bridge, a local bar in downtown Sidney, with friends. He stated that Tom, Shane Roe, and Roe's wife were seated at the bar. Chief Deputy Frye testified that a few minutes after he arrived, Mary Pat came into the bar and started "hitting Tom with her purse towards his head * * *." July 13, 2015 Hrg., p. 34. He explained that she hit Tom "four or five times, stopped, and then hit [Tom] a couple more times." *Id*. at p. 35. He added that she was "yelling pedophile and things of that nature" and using "the F word." *Id*. at p. 34-35. He testified that Tom remained seated most of the time and put his arm up to try and block contact. Frye stated that the bar's staff eventually asked Mary Pat to leave, and she did.

**{¶7}** Tom testified that he and Mary Pat had "never been particularly able to see eye to eye on stuff." *Id*. at p. 53. He added that things escalated between them in August 2014 after he sent Tim a picture from Pat's birthday celebration, and Mary Pat took offense. He explained that he jokingly told Tim he could "ring

---

[1] The following events relate to the fact that Pat Echemann ("Pat"), Mary Pat's brother-in-law and the brother of Tom and Tim Echemann ("Tim"), was indicted in the late summer/early fall of 2014 on charges relating to the sexual abuse of Tim and Mary Pat's twelve-year-old son.

Mary Pat's neck" and things escalated from there to the point that he was instructed not to be on Mary Pat's property. *Id.* at p. 126.

**{¶8}** Tom testified that on October 11, 2015, he went to The Bridge for a drink. He testified that he was sitting at the bar with Roe when "all of a sudden" someone starting hitting him hard. *Id.* at p. 58. He testified that he turned around and saw Mary Pat standing behind him swinging her purse side to side. He added that she began screaming and calling him a "fucking pedophile," "fucker," and "shit head." *Id.* at p. 59. Tom testified that Roe stood up and held onto Mary Pat's arm, which "sort of diffuse[d] that for a second." *Id.* at p. 59. He testified that Mary Pat took a seat at the bar but continued to yell and use profanity. He stated that the bar's staff asked her to leave, and she did.

**{¶9}** Tom testified that after this incident his head hurt and he felt mortified. He explained that he felt "embarrassed as hell. * * * This is a place I frequent a lot and – and – and it's just – I normally feel comfortable there * * *." *Id.* at p. 69. He stated, "I go into places now and I sit with my back to different areas" because "I don't want to have to worry about somebody comin' in and * * * shootin' me in the back of the head." *Id.* at p. 180. Tom testified that he avoided contact with Mary Pat thereafter.

**{¶10}** Tom testified on December 10, 2014, he was driving to pick up his daughter from college when he learned that Mary Pat had posted some disparaging

-4-

comments on his daughter's Facebook page. He stated that he and his ex-wife, Tami Echemann ("Tami"), immediately called Tim to try and get Mary Pat to remove the comments. Tom testified that about a half-hour later, he received a telephone call from Mary Pat in which she said, "Hello Tom, the fun is just starting." *Id*. at p. 76. Tom testified that after hearing this he "could have drove off the road." *Id*. Tami later testified to a similar event.

{¶11} Tom testified that on March 15, 2015, the day before Pat's sentencing hearing, he went to his parents' house to meet his mother and her in-home caregiver, Joan Freidet, so they could all go visit with Pat. He explained that he pulled into his parents' circular driveway and parked his car in front of his mother's wheelchair-accessible van so that the vehicles' front bumpers were facing each other. He explained that while he and Freidet were getting his mother into her van, Mary Pat pulled into the driveway and stopped behind his car. Tom stated that he walked up to her vehicle to see if she had anything to say to him. He stated that when Mary Pat saw him, she raised her middle finger toward him. Tom stated that he ignored her and continued helping Freidet.

{¶12} Tom testified that all of a sudden Mary Pat began revving her car's engine and honking the horn. He explained that the engine just started to "vroom, vroom, vroom, vroom, vroom." *Id*. at 88. He testified that he did not know what Mary Pat was going to do and he was worried for his safety and the safety of

Freidet and his mother. He explained, "When you hear a car motor of someone who's up on your tailgate of your vehicle revving its engine, you are expecting that thing to go into drive and you're expecting it to fly into whatever's ahead of it." *Id*. at p. 93. He added that at some point Mary Pat put down her windows and started playing loud music. Tom explained that he and Freidet drove their cars out the other end of the driveway and Mary Pat followed. He stated that as they drove down the street, Mary Pat had her "window down and her hands out and she's yellin' and screamin' like a mad lady." *Id*. at p. 96. He added that he had not had any contact with Mary Pat since the December 2014 phone call.

{¶13} Finally, Tom testified that he was assaulted by Tim the following day. He testified that he believed that Mary Pat incited Tim to harm him because "in my long history with her * * * anything he does, he runs it by her." *Id*. at p. 115. Officer Nick Zimmer of the Sydney Police Department later testified to a similar event.

{¶14} Freidet testified that as she was preparing to drive Tom's mother to visit Pat, she noticed another vehicle in the driveway behind Tom's car. She stated that Tom told her that she needed to back the van out of the driveway because someone was parked behind his car. She stated that the vehicle did not seem loud or appear to be making any unusual sounds but admitted that she suffered from hearing loss and may not have known whether an engine was

revving. She added, however, that the driver was "calling and hollering" and later began "screaming and waving and honking the horn." *Id*. at p. 220. She stated that she could not identify the driver but believed they were blocking the driveway so that she could not pull forward. She added she was a little upset because of the "confrontation that I was kinda placed in the middle of" but did not fear for her safety. *Id*. at p. 224.

{¶15} Mary Pat testified that she and Tom "definitely [did not] see eye-to-eye." *Id*. at p. 254. She stated that in August 2014 Tom sent Tim a picture from Pat's birthday celebration. She explained that she "found it in very poor taste to send a picture of a rapist to the mother of the child he raped." *Id*. at p. 297. She added that around this time Tom was informed not to come onto her property.

{¶16} Mary Pat explained that she "d[id] not like [Tom's] actions and what he's said about [her] son and the trauma that's happened to [her] son that he's minimized." *Id*. at 255. She explained that "at one point he sent me a text that said he thought [she] was enjoying the fact that [her] son had been molested" and that "parents make too big a deal out of things." *Id*. at p. 256-257.

{¶17} Mary Pat testified that she had gone to The Bridge to meet Roe and his wife. She admitted that she "swatted [Tom] in the head" with her cocktail purse because she wanted to "get his attention" and "tell him that it wasn't fair what he was saying." *Id*. She stated that she did not yell or scream at Tom but

told him he was "a fucking pedophile protector" because "he was protecting a pedophile who raped [her] son." *Id*. at p. 262-263. She explained that she had just been through a grand jury proceeding and "had to relive everything that had happened to [her son] and everything that Tom had minimized * * *." *Id*. at p. 260. She admitted to talking to Tom again on December 12, 2014 but denied ever stating that "the fun was just starting." *Id*. at p. 275-276.

{¶18} Mary Pat testified that on March 15, 2015, she went to her in-laws' house to drop off medicine. She testified that when she saw Tom, he walked up her window and smirked. Mary Pat stated that she did not look at Tom but "gave him the bird." *Id*. at p. 267. She testified that she wanted to leave, but she could not back out of the circular driveway because of her car's size. She explained that she revved her car's engine and honked her horn because she wanted Tom to move the cars so she could pull forward. She stated that as she waited, she turned up the music and began singing in order to distract herself. She admitted, however, that after she pulled out of the driveway and got to the end of the street, she shouted at Tom that Pat was going to prison because he abused her son.

{¶19} She testified that she never intended to cause Tom harm or mental distress. She stated that Tom had been causing her mental distress by telling people that she put Pat in prison and she believed Tom was pursuing a CSPO to get even or get her accidentally arrested. Mary Pat testified that she had had no

contact with Tom, other than a phone call, between October 2014 and March 2015.

{¶20} Upon conclusion of the hearing, the magistrate granted Tom a CSPO against Mary Pat, and the trial court adopted the magistrate's order. Mary Pat filed timely objections arguing that that magistrate erred in continuing the full hearing until July 13, 2015; the magistrate erred in refusing to let counsel for Mary Pat impeach Tom with his ex parte testimony; and there was insufficient evidence to support a finding that Mary Pat engaged in conduct that violated Ohio's menacing by stalking statute.

{¶21} By entry dated December 15, 2015, the trial court overruled Mary Pat's objections. It found that "the evidence demonstrates a pattern of conduct in which [Mary Pat] knowingly caused [Tom] to believe that [she] would cause physical harm to [him] and caused mental distress." (Docket No. 89, p. 12). In doing so, it stated,

> [Tom] testified that he was concerned for his safety and for the safety of his family. He testified he was traumatized by the incident at The Bridge Restaurant (Tr. Page 59). That a phone call he received from [Mary Pat] caused him to fear for his family (Tr. Page 77). The driveway incident caused him to fear for his safety, it was "scary, it was frightening" (Tr. Page 94). He felt hurt, [sic] humiliated, by the combined effects of the various incidents with [Mary Pat]. (Tr. Page 116) [Tom] testified that he feared for his safety, that he was concerned to the extent that he considers his sitting arrangement when going to places because of the conduct.

(*Id.* at p. 11).

{¶22} It is from this judgment that Mary Pat appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED IN DETERMINING THAT THE MAGISTRATE PROPERLY CONTINUED THE FULL HEARING AND PROPERLY EXTENDED THE EX PARTE ORDER.**

*Assignment of Error No. II*

**THE CREDIBLE EVIDENCE OF RECORD WAS INSUFFICINET TO SUPPORT A FINDING THAT RESPONDENT ENGAGED IN CONDUCT THAT VIOLATED THE MENACING BY STALKING STATUTE.**

*Assignment of Error No. III*

**THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. IV*

**THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO CONSIDER THE STATEMENTS OF THE PETITIONER AT THE EX PARTE HEARING.**

*Assignment of Error No. V*

**THE TRIAL COURT ABUSED ITS DISCRETION BY RELYING ON THE MAGISTRATE'S DETERMINATIONS REGARDING THE CREDIBILITY OF WITNESSES.**

*Motion to Dismiss*

{¶23} Before we consider the merits of Mary Pat's appeal, we must address a pending motion to dismiss. On January 15, 2016, Tom filed a motion to dismiss arguing that the instant appeal was moot insofar as the CSPO expired on January 13, 2016. In support, Tom cites decisions from the Second and Tenth District Courts of Appeals that have found that the expiration of a civil protection order renders an error in the imposition of that order moot. *E.g.*, *Erbes v. Meyer*, 2nd Dist. Montgomery No. 23917, 2011-Ohio-3274, ¶ 4; *Foster v. Foster*, 10th Dist. Franklin No. 11AP-371, 2011-Ohio-6460, ¶ 5.

{¶24} In response, Mary Pat cites other appellate courts' decisions that have found that the expiration of a civil protection order does not render an error in the imposition of that order moot because it is reasonably possible that adverse collateral consequences could occur as a result of the order. *E.g.*, *D.R. v. J.R.*, 9th Dist. Summit No. 26743, 2013-Ohio-2987, ¶ 9 (finding that collateral consequences include the effect on one's credit rating, the ability to drive certain vehicles, the ability to obtain a weapon permit, and the ability to obtain employment); *Wilder v. Perna*, 174 Ohio App.3d 586, 2007-Ohio-6635, ¶ 16 (8th Dist.) (finding that collateral consequences include harm to one's reputation); *see also Tupps v. Jansen*, 5th Dist. Ashland No. 2012-COA-26, 2013-Ohio-1403, ¶ 13 (considering merits of appeal although CSPO had expired).

**{¶25}** We agree with the Eighth and Ninth District Court of Appeals and find that the expiration of a CSPO does not render an appeal from that order moot because of the potential adverse collateral consequences that could occur as a result of the order.

**{¶26}** Accordingly, Tom's motion to dismiss is denied.

*Assignment of Error No. I*

**{¶27}** In her first assignment of error, Mary Pat argues that the full hearing was improperly continued insofar as the magistrate's continuance failed to comport with the requirements of R.C. 2903.214. We disagree.

**{¶28}** R.C. 2903.214 governs protection orders for victims of menacing by stalking and provides that after a court issues an ex parte CSPO, "the court shall schedule a full hearing for a date that is within ten court days after the ex parte hearing." R.C. 2903.214(D)(2)(a). The full hearing must be held on the scheduled date unless the court grants a continuance of the full hearing "to a reasonable time determined by the court." *Id*. A continuance may be granted under the following circumstances:

\* \* \*

 (ii)  The parties consent to the continuance.

(iii)  The continuance is needed to allow a party to obtain counsel.

(iv)  The continuance is needed for other good cause

-12-

*Id.*

{¶29} First, Mary Pat argues that the trial court erred in continuing the full hearing to May 5, 2015 because a one-month continuance is not reasonable within the meaning of the statute. However, considering that Mary Pat's counsel requested the continuance due to a scheduling conflict, and Mary Pat did not object to the rescheduled date at that time, we cannot say that this one-month continuance was unreasonable.

{¶30} Second, Mary Pat argues that the trial court erred in continuing the full hearing to July 13, 2015 because "insufficient time to hear the case" is not "good cause" and a two-month continuance is not reasonable. We cannot say, however, that an apparent scheduling conflict is not "good cause" within the meaning of R.C. 2903.214(D)(2)(a). If the trial court is unable to hold a full hearing on a CSPO on its scheduled date and there is an underlying "good cause," then it may continue the hearing to a *reasonable* time thereafter. Thus, the question is whether the trial court's continuance of 69 days was reasonable. The record shows that between May 5, 2015 and July 13, 2015, several witnesses were deposed, including Tom and Mary Pat. These depositions did not conclude until July 9, 2015—just four days before the full hearing.[2] The record also suggests that the hearing was continued, at least in part, because Mary Pat obtained new

---

[2] We are not suggesting that rules governing discovery necessarily apply in proceedings for protection orders. However, both parties participated here, and neither objected, nor raised the issue on appeal.

counsel, and again, Mary Pat did not object to the length of the continuance at that time. For these reasons, we cannot say that this 69-day continuance was unreasonable.

**{¶31}** Accordingly, Mary Pat's first assignment of error is overruled.

*Assignments of Error Nos. II & III*

**{¶32}** In her second and third assignments of error, Mary Pat argues that the record contains insufficient evidence to support the issuance of the CSPO and that the issuance of the CSPO was against the manifest weight of the evidence. We disagree.

**{¶33}** "When reviewing a trial court's decision to grant a civil protection order, we will not reverse the decision absent an abuse of discretion." *Retterer v. Little*, 3d Dist. Marion No. 9-11-23, 2012-Ohio-131, ¶ 23, citing *Van Vorce v. Van Vorce,* 3d Dist. Auglaize No. 2–04–11, 2004–Ohio–5646, ¶ 15. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 16-18 (2d Dist.). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "[I]f there is some competent, credible evidence to support the trial court's decision regarding a CSPO petition, there is no abuse of

discretion." *Retterer* at ¶ 23, citing *Warnecke v. Whitaker,* 3d Dist. Putnam No. 12–11–03, 2011–Ohio–5442, ¶ 12.

**{¶34}** R.C. 2903.214 governs the issuance of a CSPO. It states, in relevant part:

> (C) A person may seek relief under this section * * * by filing a petition with the court. The petition shall contain or state all of the following:

> (1) An allegation that the respondent is eighteen years of age or older and engaged in a violation of section 2903.211 of the Revised Code against the person to be protected by the protection order * * *.

R.C. 2903.211, Ohio's menacing by stalking statute, provides that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." " 'To be entitled to a CSPO, the petitioner must show by a preponderance of the evidence that the respondent engaged in a violation of [this statute] * * * against him or her.' " *Prater v. Mullins*, 3d Dist. Auglaize No. 2-13-04, 2013-Ohio-3981, ¶ 7, quoting *Retterer* at ¶ 25. "In other words, the petitioner must establish by a preponderance of the evidence that the respondent (1) engaged in a pattern of conduct (2) that the respondent knew (3) would cause the person to be protected under the CSPO to believe that the respondent would cause the person physical harm *or* mental distress." (Emphasis sic.) *Prater* at ¶ 7, citing *Retterer* at ¶ 26.

**{¶35}** R.C. 2903.211(D)(1) defines pattern of conduct as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." "Closely related in time" is not defined. "In failing to delimit the temporal period within which the two or more actions or incidents must occur, the statute leaves that matter to be determined by the trier of fact on a case-by-case basis." *Ellet v. Falk,* 6th Dist. Lucas No. L–09–1313, 2010-Ohio-6219, ¶ 22, citing *State v. Dario,* 106 Ohio App.3d 232, 238 (1st Dist.1995). But the trier of fact should consider the "evidence in the context of all the circumstances of the case." *Holloway v. Parker*, 3d Dist. Marion No. 9-12-50, 2013-Ohio-1940, ¶ 22, quoting *Retterer* at ¶ 29. Therefore, depending upon the particular circumstances, a pattern of conduct can arise out of two or more actions or incidents occurring on the same day or over a period of years. *E.g.*, *Retterer* at ¶ 33 (pattern of conduct occurring over a five-year period).

**{¶36}** R.C. 2901.22(B) provides that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." "Consequently, a petitioner seeking a CSPO under [Ohio's menacing by stalking

statute] is not required to prove purpose or intent to cause physical harm or mental distress." *Retterer*, 2012-Ohio-131 at ¶ 35, citing *Ellet* at ¶ 30.

**{¶37}** Moreover, R.C. 2903.211(A)(1) does not require the petitioner to demonstrate that he or she actually suffered physical harm. The petitioner merely has to demonstrate that the respondent knowingly caused the petitioner to believe that the respondent would cause him or her physical harm. R.C. 2903.211(A)(1). However, if the petitioner claims mental distress, then the statute requires evidence that the petitioner suffered from a mental illness or condition that involved some temporary substantial incapacity or that would normally require mental health services. R.C. 2903.211(D)(2). "Incapacity is substantial if it has a significant impact upon the victim's daily life." *Retterer* at ¶ 41, quoting *State v. Horsley*, 10th Dist. Franklin No. 05AP–350, 2006–Ohio–1208, ¶ 48. Mental distress is not simply stress or annoyance. *Caban v. Ransome*, 7th Dist. Mahoning No. 08 MA 36, 2009–Ohio–1034, ¶ 29.

**{¶38}** Here, it is undisputed that Mary Pat hit Tom with her purse at The Bridge. It is also undisputed that Mary Pat made an obscene gesture, revved her engine, and honked her horn at Tom in her in-laws' driveway. These two instances are sufficient to establish a "pattern of conduct" within the meaning of R.C. 2903.214, especially in light of the minimal contact between Tom and Mary Pat around this time. Moreover, Tom and Tami testified that in between these two

incidents, Mary Pat told Tom that "the fun [was] just beginning." July 13, 2015 Hrg., p. 76.

**{¶39}** Tom argues that his physical altercation with Tim also supports the issuance of a CSPO against Mary Pat. But this incident did not involve Mary Pat, and the only "evidence" linking Mary Pat to Tim's conduct is Tom's testimony that he believed Mary Pat had something to do with it because "anything [Tim] does, he runs it by her." *Id*. at p. 115. This evidence is insufficient to constitute an "action or incident" by Mary Pat.

**{¶40}** Tom also testified that his head hurt after the bar incident and that he was worried someone may hurt him. He testified that he was concerned for his safety and the safety of those around him during the driveway incident. This testimony is sufficient to establish that Tom believed Mary Pat would cause him physical harm. Moreover, he also added that he "could have drove off the road" after he heard Mary Pat's comment that "the fun [was] just beginning." *Id*. at p. 76.

**{¶41}** The trial court also suggested that Mary Pat caused Tom mental distress insofar as it noted that "[Tom] felt hurt [sic] humiliated, by the combined effects of the various incidents with [Mary Pat]." (Docket No. 89, p. 11) But "mental distress" within the meaning of R.C. 2903.211(D)(2) requires more than hurt or humiliation; the statute requires evidence that the person to be protected

suffered from a mental illness or condition that involved some temporary substantial incapacity or that would normally require mental health services, and no such evidence was presented here.

**{¶42}** While Mary Pat argues that she never intended to harm Tom, her intent is immaterial. Instead, all that is required is that she acted knowingly (i.e. she was aware that her conduct would probably cause a certain result or would probably be of a certain nature). Given the nature of Mary Pat and Tom's relationship and the nature of Mary Pat's conduct, there is sufficient evidence to establish that Mary Pat acted knowingly and that her conduct caused Tom to believe that she may cause him physical harm.

**{¶43}** For these reasons, the trial court did not abuse its discretion in granting Tom a CSPO against Mary Pat. Accordingly, Mary Pat's second and third assignments of error are overruled.

*Assignments of Error Nos. IV & V*

**{¶44}** In her fourth and fifth assignments of error, Mary Pat argues that the trial court erred in failing to consider Tom's statements at the ex parte hearing when making its determinations as to her objections and relying on the magistrate's determinations as to the credibility of the witnesses. We disagree.

**{¶45}** After the magistrate issued Tom a CSPO against her, Mary Pat filed timely objections arguing, in part, that "the magistrate abused his discretion when

he refused to allow [counsel for Mary Pat] to impeach [Tom] with his own sworn testimony from the ex parte hearing." (Docket No. 64, p. 5). This objection concerned a statement by Tom at the ex parte hearing that Mary Pat "rammed" his car in his parents' driveway. Mar. 20, 2015 Hrg., p. 13.

**{¶46}** In its entry denying Mary Pat's objections, the trial court noted that it "[could not] find in the [full hearing's] transcript where [Tom] was cross-examined regarding an inconsistent statement, where the magistrate denied the use of extrinsic evidence, or where [counsel for Mary Pat] proffered the inconsistent statement." (Docket No. 89, p. 8). It went on to note that the statement, even if presented,

> would only have gone to the credibility of [Tom] and the weight to be given to his testimony. * * * Even if the [statement] had been available and introduced, it would have likely had little impact on the magistrate's decision. [Mary Pat] conceded most of the circumstances of the driveway incident[,] and [Tom's] testimony at the full hearing was more favorable to [Mary Pat] than his testimony at the ex parte hearing.

(*Id.* at p. 9).

**{¶47}** Now, Mary Pat argues that

> [Tom's] statements at the [full] hearing were contradicted by his statements at the [e]x [p]arte hearing. However, while the [m]agistrate indicated that the [e]x [p]arte testimony was a matter of record ('The record speaks for itself'), the [trial] [c]ourt refused to consider these inconsistencies in making its determinations. It stated that 'even if the testimony had been available and introduced, it would likely have had little impact on the [m]agistrate's decision'

and suggested only that his testimony 'may' have differed at the [f]ull hearing.

Appellant's Brief, p. 18.

{¶48} But the trial court never stated that it refused to consider Tom's statements at the ex parte hearing in making its determinations as to Mary Pat's objections; it stated that Mary Pat's objection—that the magistrate abused his discretion when he refused to allow [counsel for Mary Pat] to impeach [Tom] with his own sworn testimony from the ex parte hearing—was without merit because counsel for Mary Pat never tried to impeach Tom at the full hearing with his statements from the ex parte hearing. Moreover, the trial court stated, "[Tom's] testimony at the full hearing was more favorable to [Mary Pat] than his testimony at the ex parte hearing." (Docket No. 89, p. 9). This necessarily suggests that that the trial court reviewed the transcripts from both hearings.

{¶49} To that end, Mary Pat argues that the trial court erred in relying on the magistrate's determination as to Tom's credibility because his testimony at the full hearing was inconsistent with his testimony at the ex parte hearing. However, it is well established that the trial court may rely on upon the magistrate's credibility determinations when it reviews the magistrate's decision. *Mackenbach v. Mackenbach*, 3rd Dist. Hardin No. 6-11-03, 2012-Ohio-311, ¶ 9, citing *Gilleo v. Gilleo*, 3d Dist. Mercer No. 10–10–07, 2010–Ohio–5191, ¶ 47.

**{¶50}** For these reasons, the trial court did not err in failing to consider Tom's statements at the ex parte hearing in making its determinations as to Mary Pat's objections and relying on the magistrate's determinations as to the credibility of the witnesses.

**{¶51}** Accordingly, Mary Pat's fourth and fifth assignments of error are overruled.

**{¶52}** Having found no error prejudicial to the appellant, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J.J., concur.**

**/jlr**