WILDER, f.k.a., Perna, Appellee,

v.

PERNA, Appellant.

[Cite as *Wilder v. Perna*, 174 Ohio App.3d 586, 2007-Ohio-6635.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 89253.

Decided Dec. 13, 2007.

James G. Meimaris, for appellee.

Phillips, Mille & Costabile Co., L.P.A., Gregory S. Costabile, and Henry J. Phillip, for appellant.

John V. Heutsche Co., L.P.A., and John V. Heutsche, guardian ad litem.

SEAN C. GALLAGHER, Presiding Judge.

{¶ 1} Appellant, Rosario Perna Jr., appeals the judgment of the Cuyahoga County Court of Common Pleas, Division of Domestic Relations, that (1) ordered a domestic-violence civil protection order issued in August 2006, as modified, to remain in full force and effect until September 11, 2007, (2) ordered Rosario to attend and complete an anger-management class, and (3) imposed greater restrictions on Rosario's parenting time. For the reasons stated herein, we reverse the decision of the trial court and vacate the domestic-violence civil protection order.

I

{¶ 2} Rosario was divorced from appellee, Glenda Joyce Wilder, on August 23, 1999. The parties had one child, J.P., who was nine years old at the time of the incident involved in this appeal. At the time of the incident, the parties had an agreed parenting schedule in place.

{¶ 3} On August 16, 2006, Glenda filed a petition for a domestic-violence civil protection order seeking to protect her minor child, J.P., as a result of an incident that occurred the previous day. The trial court issued an ex-parte civil protection order and set the matter for a full hearing. The hearing was held before a court magistrate.

{¶ 4} The testimony adduced at the hearing revealed that on August 15, 2006, J.P. attended a soccer practice. There is a dispute as to whether Rosario's parenting time that day ended at 8:00 p.m. or 9:00 p.m. Apparently, Rosario's summer weekday visits were from 6:00 p.m. to 9:00 p.m., but there was a dispute as to the day in question because it was during the week before school started.

{¶ 5} Glenda had asked another parent, Julie Shaffer, to take her daughter to soccer practice, which was at 6:30 p.m. and was supposed to end at 8:30 p.m. Shaffer had known Glenda for some period of time, and their children attended school and played soccer together. Glenda informed Shaffer that she would be picking J.P. up from the practice. Glenda also told Shaffer that Rosario might be at the practice because it was his visitation day, but that his visitation ended at 8:00 p.m. and that Glenda would be there to get J.P. Rosario was in fact at the practice.

{¶ 6} The practice concluded about one-half hour early, a little after 8:00 p.m. Shaffer called Glenda, who was almost there, to let her know. The girls, including J.P., went to walk around a track, which went back through some woods. Shaffer claimed that after Rosario saw the girls walking around in the woods, Rosario began yelling at J.P. Shaffer stated that she pushed J.P. behind

her and told Rosario that Glenda was coming to pick up J.P. Shaffer asserted that Rosario shoved Shaffer out of the way, grabbed J.P. by the arm, and told Shaffer that she was interrupting his visit. Shaffer indicated that J.P. did not object to going with her father, and she did not complain about her arm. Shaffer stated, however, that J.P. was upset and crying.

{¶ 7} Jennifer O'Banion, a parent whose daughter is a friend of J.P., was also present at the soccer practice. O'Banion stated that she saw Rosario, whom she did not know at the time, walk over to Shaffer and ask, "Where is [J.P.]? I want to take her to get something to eat." Shaffer told Rosario that the girls were walking around the track, and Rosario indicated that he would wait. However, the girls were taking a while, and Rosario began to grow impatient. He eventually went to get J.P. and told her that she had to go with him. O'Banion observed as Rosario began to yell at J.P. and J.P. began crying. O'Banion also watched Shaffer walk over to Rosario and tell him that she was on the telephone with Glenda and that Glenda stated that he could not take J.P. O'Banion testified that Rosario then started to pull J.P., and Shaffer "took [J.P.'s] arm and put [J.P.] behind her so [Rosario] couldn't take her." O'Banion heard J.P. saying that she had to go with [Rosario] and Shaffer responding, "Your mom said you can't go with him." O'Banion also saw Rosario push Shaffer and threaten Shaffer.

{¶ 8} When Glenda arrived, she saw Rosario screaming at Shaffer and yelling at J.P. Glenda told Rosario that his visit was over and that she was taking J.P. home. Glenda claimed that Rosario blocked her with his vehicle and was yelling at her. J.P. was still crying. Glenda decided to go to the police station. Glenda claimed that while at the police station, J.P. was holding her arm up. According to Glenda, when she asked J.P. what was wrong, J.P. stated that her dad had pulled her arm and she heard her elbow pop. Glenda took J.P. to the emergency room, where J.P.'s arm was placed in a splint.

{¶ 9} There was also some testimony concerning an alleged incident on July 16, 2006. Glenda stated that J.P. had called her while J.P. was with Rosario and that she was crying and wanted to be picked up. Glenda asserted that when she picked up J.P., J.P. was complaining about a bruise on her leg that allegedly had been caused by Rosario smacking her leg. However, Glenda never questioned Rosario about the bruise. Glenda also testified that she was personally afraid of Rosario because of the arguments they have had and because he told her he was not through with her yet.

{¶ 10} Jill Silvaggi, J.P.'s nanny who lives with Rosario, testified that she accompanies Rosario during his parenting time. Silvaggi denied that she was Rosario's girlfriend. Silvaggi was present at the soccer practice on August 15, 2006. She stated that Rosario was not able to take J.P. with him following the

practice because Shaffer stood in the way. Silvaggi testified that Shaffer had "yanked" J.P.'s right arm and that J.P. ran to Silvaggi crying. Silvaggi stated that she asked J.P. if she was okay and J.P. responded "yes." Silvaggi also stated that she did not observe Rosario pull on J.P.'s arm or become violent with J.P. With respect to the July 16, 2006 incident, Silvaggi stated that she, Rosario, and J.P. went to a festival. Silvaggi stated that she did not witness any injuries to J.P.

{¶ 11} Silvaggi also indicated that J.P. cries when she does not get her way, will stretch the truth, and will "play each parent against each parent." Silvaggi suggested that Glenda would put words into J.P.'s mouth and was coaching her to say her father was the culprit.

{¶ 12} Following the hearing, the magistrate issued a decision. Despite finding that there "was nothing to suggest that [Rosario] intended to harm the child and not every time a child is injured must a parent be guilty of domestic violence," the magistrate concluded that Rosario had recklessly injured the child. The magistrate concluded that credible testimony was presented that Rosario had committed an act of domestic violence as defined in R.C. 3113.03. The magistrate's decision restricted Rosario's parenting time, imposed supervised visitation, and required Rosario to attend an anger-management course.

{¶ 13} Rosario filed objections to the magistrate's decision, which were overruled in part, with one slight modification to Rosario's parenting time. The trial court also corrected certain inadvertent errors appearing in the magistrate's decision. The trial court ordered that the protection order was to remain in effect until September 11, 2007. Rosario timely filed this appeal.

## II

{¶ 14} We first address the issue whether this appeal is moot. We previously instructed the parties to submit briefs on this issue because the domestic-violence civil protection order expired on September 11, 2007, and no extension was granted.

{¶ 15} Several Ohio courts have held that when a domestic-violence civil protection order has expired and is no longer in effect, an appeal with respect to that order is moot. See, e.g., *Hughes v. Hughes*, Lake App. No. 2006–L–196, 2007-Ohio-4774, 2007 WL 2696845; *Vanmeter v. Vanmeter*, Franklin App. No. 03AP–1107, 2004-Ohio-3390, 2004 WL 1446055; *Saffold v. Saffold* (May 13, 1999), Cuyahoga App. No. 72937, 1999 WL 304310. However, at least one court has found that an exception to the mootness doctrine should be applied. In *Cauwenbergh v. Cauwenbergh*, Ashtabula App. No. 2006–A–0008, 2007-Ohio-1070, 2007 WL 726951, the court agreed with the view, held by other states, that such orders

are not rendered moot by their expiration, because of the resulting collateral consequences. In reaching its decision, the *Cauwenbergh* court relied upon the Connecticut case of *Putman v. Kennedy* (2006), 279 Conn. 162, 173–174, 900 A.2d 1256. In *Putman,* the Supreme Court of Connecticut concluded, "it is reasonably possible that adverse collateral consequences of the domestic violence restraining orders may occur, and, therefore, the defendant's appeals are not rendered moot by virtue of the expiration of the orders during the pendency of the appeals." 279 Conn. at 175, 900 A.2d 1256. The court recognized as follows:

The array of collateral consequences that will preclude dismissal on mootness grounds is diverse, and includes harm to a defendant's reputation as a result of the judgment at issue. * * *

* * * [T]he present case fits squarely within the bounds of our prior cases recognizing reputation harm and other potential legal disabilities as collateral consequences of otherwise moot court orders. The threat of reputation harm is particularly significant in this context because domestic violence restraining orders will not issue in the absence of the showing of a threat of violence * * *. Thus, inasmuch as we previously have recognized the importance of reputation damage as a collateral consequence in other contexts, we see no reason not to do so here, for being the subject of a court order intended to prevent or stop domestic violence may well cause harm to the reputation and legal record of the defendant.

Moreover, as the defendant points out, domestic violence restraining orders have other collateral legal disabilities for their subjects. Once filed, they are available to agencies investigating future allegations involving the same family, and a trial judge making a future custody determination also reasonably might consider the issuance of a domestic violence restraining order in making that sensitive decision. * * * Thus, in the sensitive and often explosively litigated context of family dysfunction and dissolution, there is a reasonable possibility that a domestic violence restraining order will have prejudicial collateral legal consequences for its subject, even after its expiration. Accordingly, the subject of an improperly rendered domestic violence restraining order is likely to benefit from the vacatur of that order, and dismissal of his or her appeal as moot solely on the basis of that order's expiration is improper.

Indeed, the court's independent research reveals that the majority of the other states that have considered this issue have concluded that appeals from domestic violence restraining orders are not rendered moot by their expiration.

[fn 13]The minority view * * * is that the expiration of a domestic violence restraining order renders an appeal from that order moot. * * * We disagree with [the minority view] because a conclusion that the expiration of a domestic violence restraining order renders an appeal from that order moot ignores the

gravity of these orders for the individuals involved, and is, therefore, inconsistent with our developing collateral consequences jurisprudence.

*Putman,* 279 Conn. at 169–174, 900 A.2d 1256.

{¶ 16} We agree with the view expressed in *Putman* and adopted in *Cauwenbergh.* We conclude that this appeal is not rendered moot by virtue of the expiration of the domestic-violence civil protection order, because it is reasonably possible that adverse collateral consequences may occur. Accordingly, we will proceed to address the merits of the appeal.

### III

{¶ 17} Rosario has raised three assignments of error for our review:

{¶ 18} "I. The trial court erred in granting plaintiff/appellee's petition for a civil protection order as there was not sufficient credible evidence to support a finding that the defendant/appellant engaged in acts or threats of domestic violence."

{¶ 19} "II. The trial court erred and abused its discretion in overruling defendant/appellant's objections to the magistrate's decision and adopting the magistrate's decision under Civ.R. 53(E)(3), as the court's decision is not supported by sufficient credible evidence to support a finding that the defendant/appellant engaged in acts or threats of domestic violence."

{¶ 20} "III. The trial court erred and abused its discretion by overruling defendant/appellant's objections to the magistrate's decision by failing to conduct its own de novo determination by undertaking an independent analysis of the issues."

{¶ 21} When granting a domestic-violence civil protection order under R.C. 3113.31, the trial court must find that the petitioner has shown by a preponderance of the evidence that the petitioner or the petitioner's family or household members are in danger of domestic violence. *Felton v. Felton* (1997), 79 Ohio St.3d 34, 679 N.E.2d 672, paragraph two of the syllabus, citing R.C. 3113.31(D). When a defendant contends that it was error to issue a protection order, the question on review is whether there was sufficient credible evidence to support a finding that the defendant had engaged in acts or threats of domestic violence. See *Abriani v. Abriani,* Cuyahoga App. Nos. 88597 and 88599, 2007-Ohio-3534, 2007 WL 2008887; *Vasile v. Marinescu,* Cuyahoga App. No. 86953, 2006-Ohio-1739, 2006 WL 891026.

{¶ 22} "Domestic violence" is defined by R.C. 3113.31(A)(1) as
the occurrence of one or more of the following acts against a family or household member:
   (a) Attempting to cause or recklessly causing bodily injury;

(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;

(c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code.

{¶ 23} In this case, the trial court found that although there "was nothing to suggest that [Rosario] intended to harm the child," Rosario had recklessly injured the child. "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶ 24} In this case, conflicting evidence was introduced as to whether Shaffer or Rosario or both had pulled J.P. by the arm. Even the trial court conceded that it was "not outside the realm of possibility that Ms. Shaffer injured the child in her attempt to keep [Rosario] from taking her. * * * Everything in her manner as well as in her testimony indicated that she would not have been at all loath to have engaged in [a tug of war over the child]." The trial court further found that there were "reasons to question the testimony" of Silvaggi, Shaffer, and Glenda. These findings fail to show that the petitioner had shown by a preponderance of the evidence that J.P. was in danger of domestic violence.

{¶ 25} Further, the evidence indicates that Rosario, who was J.P.'s father, believed that it was his parenting time. Shaffer, despite acting upon Glenda's instructions, essentially stood in the way of Rosario taking his own daughter. Even though J.P. stated that she had to go with her father, Shaffer continued to stand in the way. We recognize that Rosario's conduct may have been admonishable; however, there was a lack of sufficient credible evidence to suggest that Rosario perversely disregarded a known risk that his conduct was likely to cause harm to J.P. It appears from the record that Rosario was merely attempting to take his daughter with him, but Shaffer stood in the way. Although J.P. was crying and her arm was placed in a splint as a result of this incident, this alone is insufficient to establish that Rosario's actions constituted domestic violence.

{¶ 26} Likewise, insofar as testimony was presented concerning a bruise sustained by J.P. on July 16, 2006, sufficient, credible testimony was not introduced to establish that Rosario caused the bruise, let alone did so in a manner rising to the level of domestic violence. We must recognize that nothing in R.C. 3113.31 prevents a parent from properly disciplining his child, and each case must be reviewed on a case-by-case basis. See *Thompson v. Koontz* (Nov. 22, 2000), Cuyahoga App. No. 77251, 2000 WL 1739291.

{¶ 27} In the case sub judice, after thoroughly considering the record, we find that sufficient, credible evidence was not presented to support a finding that Rosario had engaged in acts or threats of domestic violence. Accordingly, we find that the trial court erred in issuing the domestic-violence civil protection order. Rosario's first and second assignments of error are sustained.

{¶ 28} We find no merit to Rosario's third assignment of error.

{¶ 29} We reverse the decision of the trial court and vacate the protection order.

Judgment reversed<br>and protection order vacated.

CALABRESE and BLACKMON, JJ., concur.