[Cite as *T.D. v. C.N.*, 2018-Ohio-1840.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105994**

**T.D.**

PLAINTIFF-APPELLEE

vs.

# C.N., ET AL.

DEFENDANTS-APPELLANTS

**JUDGMENT:**
AFFIRMED AS MODIFIED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-17-880773

**BEFORE:** Blackmon, J., McCormack, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** May 10, 2018

**ATTORNEY FOR APPELLANTS**

Carolyn W. Allen
1669 East 73rd Street
Cleveland, Ohio 44103


**FOR APPELLEE**

T.D., pro se
7715 Decker Avenue
Cleveland, Ohio 44103

PATRICIA ANN BLACKMON, J.:

**{¶1}** Respondents-appellants, C.N. and B.N. (collectively referred to as "appellants"), appeal from the trial court's granting of petitioner-appellee T.D.'s (referred to as "appellee") petition for a civil stalking protection order ("CSPO") and from the trial court's denial of relief from that order.[1]

**{¶2}** Appellants assign the following errors for our review:

I. The trial court abused its discretion when it issued a CSPO against appellants as the evidence presented failed the preponderance of the evidence requirement needed for a civil protection order for menacing by stalking.

II. The trial court abused its discretion when it issued a CSPO against appellants as the granting of said order was against the manifest weight of the evidence

III. The trial court abused its discretion when it denied the appellants' Civ.R. 60(B) motion for relief from judgment as the terms of the CSPO were overreaching, over-restrictive, and unsupported by the evidence, thus infringing upon the appellants' civil and constitutional rights causing them personal harm and humiliation.

**{¶3}** Having reviewed the record and pertinent law, we modify the CSPO to indicate that appellants are not to be present within 50 feet of appellee. As so modified, the judgment of the trial court is affirmed. The apposite facts follow.

**{¶4}** On May 23, 2017, appellee filed a petition for a CSPO against appellants. On June 5, 2017, the trial judge issued a temporary restraining order against appellants.

---

[1]As required under 18 U.S.C. 2265(d)(3), we are to maintain confidentiality, and therefore changed the caption of this case to initials only.

The trial judge thereafter ordered a full hearing on appellee's CSPO on June 14, 2017. On June 16, after a three-day hearing, the trial court issued the following form order:

> The Court finds by a preponderance of the evidence that 1) [appellants] knowingly engaged in a pattern of conduct that caused [appellee] to believe that [appellants] will cause physical harm or cause or has caused mental distress; and 2) the following orders are equitable, fair, and necessary to protect the persons named in this Order from stalking offenses.

{¶5} The trial judge ordered the appellants "not to be present within 500 feet" of the protected person, which the order identifies as appellee. The terms of the order are effective until June 15, 2018.

{¶6} The facts of this case are not complicated. Although at the trial of this matter, the appellants highly contested the allegations of appellee, appellee consistently maintained that the offending behavior or conduct of appellants, from April 2014 through November 2015 at Ward 7 council meetings, continued until it culminated on May 15, 2017. In his application for a restraining order he stated the following:

> [Appellants] on or about May 15, 2017 at 10:00 a.m. at the Cuyahoga County Board of Elections located at 2925 Euclid Avenue, Cleveland, Ohio 44115 approached me bent over while I was sitting in the chair, she put [her] finger in [my] face stating, "I'm going to get you!" Then she proceeded to walk outside the board room. I waited a moment then walked out of the board meeting and was met by verbal threats from [appellants] stating, "[You're] going to get it, wait and see." This culminated over years of stalking by [appellants], they have come to meetings, acted unruly, looked at me in a menacing way and [have] driven by my house multiple times with the purpose of intimidation.

{¶7} Appellee was elected Cleveland City Councilman of Ward 7 at the time the incidents occurred. The appellants are citizens and residents of Ward 7 and attend the council's meetings.

**{¶8}** Something clearly went wrong between these parties that resulted in the appellee seeking a restraining order against the appellants. The trial court heard the evidence of the parties and their witnesses and concluded that a preponderance of the evidence established that appellee was entitled to the CSPO order against the appellants.

**{¶9}** The record establishes the following: According to a precinct committee person, during a precinct meeting at Oriana House, appellants and a group of individuals ran through the facility, "hollering and disrupting the meeting that we just had to close it out." They were also disruptive at another meeting at the Sight Center.

**{¶10}** According to appellee, the disruptive behavior continued from April 2014 through November 2014, which prompted the ward club to hire security due to appellants' conduct. Appellee stated that "they blurt stuff out and they will reference me." They were "disrespecting" him, making comments, and threatening comments under their breath. They would enter into his personal space and look at him in a threatening way, but did not ask a question or appear to have a legitimate reason for approaching him. Appellee spoke to a police liaison about the matter and obtained security for subsequent meetings. Appellee submitted as exhibits various invoices to pay for off-duty police officers, who were present at eight meetings.

**{¶11}** Appellee also testified that during a meeting at the Sight Center in 2016, appellants and their group were so disruptive that the police officer at the meeting terminated it, and the Sight Center banned the city from holding further meetings there.

By 2016, the meetings were moved to the third district police department community room due to security issues.

{¶12} Additionally, according to appellee, in 2017, appellants filed a challenge with the Board of Elections disputing his Cleveland residency, and claiming that he was living and working in Florida. In April 2017, in response to the residency challenge, appellee wrote a letter to the Board of Elections in which he stated that he believed that he had been menaced by appellants.   He wrote:

> [T]he complaints seemed to be filed in retaliation for doing my due diligence of following up on several residents' complaints.   The complaints were concerning drug activity at [Appellants' residence]. My follow-up on these allegations was not personal.   I did what any councilperson would do if these allegations were brought to their attention.

{¶13} Appellee acknowledged that the drug allegations had not been substantiated.  Later, C.N. filed a public records request for appellee's communications involving them, their property, and the ward club meetings.

{¶14} Appellee testified that after the residency challenge was rejected by the Board of Elections, B.N. "got very mad," so she confronted appellee, put her finger in his face, and threatened that "we're going to get you."   According to appellee, when he walked toward the exit, appellants threatened him again, saying, "we're going to get you."  As he attempted to leave, they and another individual continued to go after him, but then changed course when a police officer escorted him outside.   Appellee stated that he was in fear of physical harm.

**{¶15}** Appellee also testified that on multiple occasions, appellants drove by his house, making faces, or giggling and laughing, all in an attempt to taunt or intimidate him. He stated that appellants drove by his house twice in May 2017 and looked at him in a menacing and very angry way that made him afraid.

**{¶16}** Appellants presented evidence from community members and also testified on their own behalf. A resident testified that he has attended numerous city meetings and has never observed appellants behaving in an unruly fashion, and has never witnessed angry or menacing behavior. The resident also denied that appellants brought others who were disruptive. He acknowledged that during the meetings, residents asked serious questions about expenditures, but he stated, appellee "has a bully mentality."

**{¶17}** Another resident testified that he attended the 2016 Sight Center meeting and that opinions were sometimes expressed "vociferously," and "a little loud." He admitted that there was a concern that it was getting "contentious." However, he denied that appellants were menacing or threatening. The resident also testified that a March 2017 meeting concerning the Baseball Heritage Museum also became contentious. He and C.N. began a chant demanding a citizen vote regarding a zoning change, but were not threatening or intimidating. Rather, C.N. was outspoken and "just wants answers."

**{¶18}** B.N. testified that she and her husband operate a program for providing information to voters, and they attend all ward club meetings, city council meetings, and other community-related meetings. She denied being disruptive at meetings, and denied disrupting the 2016 Sight Center meeting.

**{¶19}** With regard to the Board of Elections matter, B.N. stated that after their residency challenge against appellee was rejected, she politely told appellee that his "lies were going to catch up with him." She explained that she made this remark in reference to appellee's claim of drug activity at appellants' home and his claim that appellants were trying to intimidate him. She denied threatening appellee, but she acknowledged that she "did see him out" of the meeting, but did not confront him.

**{¶20}** B.N. admitted that on May 14, 2017, appellants drove down appellee's street, and conducted "a survey" of his neighbors in order to verify his statements to the Board of Elections that he knows his neighbors. She also stated that one of her friends lives on appellee's street. B.N. testified that during all of the times that she and C.N. have driven on his street, they have never seen appellee.

**{¶21}** B.N. also testified that she learned from a friend that appellee accused appellants of being associated with a drug house. After that, during a May 2017 council meeting, she publicly asked appellee about his accusation. Finally, she testified that the ex parte order precluded her from attending community meetings and ward club meetings.

**{¶22}** C.N. testified that he is involved in a voter information program and also does work in conjunction with the League of Women Voters. At the time of the trial, he was involved in helping an individual who was running against appellee. C.N. stated that he decided to "test" appellee's residence, so he filed a petition with the Board of Elections "just to see what would come out of it." He stated that he and B.N. believed that appellee was responsible for a letter sent to neighbors accusing them of being drug

dealers and running a drug ring out of the water department. He denied getting in appellee's personal space threatening him or intimidating him, but he admitted to speaking loudly during the meetings.

{¶23} An individual who attended the meeting testified that B.N. said something to appellee following the Board of Elections meeting, but she did not follow appellee and did not confront him a second time as he exited.

{¶24} On June 16, 2017, the trial court determined that appellants engaged in a pattern of conduct that knowingly caused appellee mental distress, and that all required elements for granting the CSPO had been proven by a preponderance of the evidence. Among its provisions, the CSPO is to remain in effect for one year, and bars appellants from being within 500 feet of appellee.

{¶25} Two weeks after the CSPO was issued, appellants moved for relief from judgment, asserting that it was overly restrictive, unsupported by the evidence, and infringes upon their civil and constitutional rights because it bars them from participating in political and community events. Additionally, they claimed that it impairs C.N.'s performance of his job at the city library. They asked the court to modify the 500-foot restriction to 50 feet. They presented no evidence in support of their motion, however. The trial court denied the motion, and appellants appeal both rulings herein.

{¶26} Before beginning our analysis, we would like to outline the events that have transpired during the pendency of the CSPO. After the CSPO was issued, appellants filed a motion for relief from judgment and did not appeal to this court until July 13,

2017, or approximately 27 days later. This court assigned the matter to the accelerated docket. Next, appellants sought extensions for filing their merit brief, which was ultimately filed on October 6, 2017. Appellee filed his merit brief on November 28, 2017, but it was unsigned, and he was given until December 12, 2017 to refile it. In January 2018, the matter was scheduled for oral argument on March 5, 2018. The foregoing proceedings occupied a significant portion of the one-year span during which the CSPO was ordered into effect. In any event, even if the appeal had consumed the entire one-year period of the CSPO, the appeal would not have been rendered moot. *Echemann v. Echemann*, 3d Dist. Shelby No. 1-15-19, 2016-Ohio-3212, ¶ 24, citing *Wilder v. Perna*, 174 Ohio App.3d 586, 2007-Ohio-6635, 883 N.E.2d 1095, ¶ 16 (8th Dist.).

## CSPO

**{¶27}** In the first assigned error, appellants assert that appellee failed to establish the need for a civil protection order for menacing by stalking, by a preponderance of the evidence.

**{¶28}** In order for a civil stalking protection order to issue, the trial court must find that the petitioner has shown by a preponderance of the evidence the respondent committed an act against the petitioner that would constitute menacing by stalking under R.C. 2903.211. *Vega v. Tomas*, 8th Dist. Cuyahoga No. 104647, 2017-Ohio-298, ¶ 10, citing *Lewis v. Jacobs*, 2d Dist. Montgomery No. 25566, 2013-Ohio-3461, ¶ 9.

**{¶29}** R.C. 2903.21(A) in turn provides that

[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

R.C. 2903.211(A)(1).

{¶30} A "pattern of conduct" is "two or more actions or incidents closely related in time[.]" R.C. 2903.211(D)(1). An individual acts "knowingly" when he is aware his conduct will probably cause a certain result. R.C. 2901.22(B). "Mental distress" is defined as any mental illness or condition that either causes temporary substantial incapacity or would require treatment by a mental health professional or other mental health services, whether or not help was actually sought. R.C. 2903.211(D)(2).

{¶31} In this matter, the trial court determined that appellee met his burden of proving by a preponderance of the evidence that appellants acted in a pattern of activity knowingly causing appellee to believe that he was being threatened or causing him mental distress. After reviewing the record from the full hearing on the petition for a CSPO, we agree with the trial court's determination, as we find sufficient evidence to meet the preponderance of the evidence standard.

{¶32} The evidence demonstrated that beginning in 2014, appellee hired security due to appellants' conduct. Appellee testified that on a number of occasions, they have "walked up on him in a very threatening way." They got in his personal space and would

verbally reference him. During meetings in 2016, appellants were part of a group that was so disruptive at a meeting at the Sight Center that the Ward Club was subsequently banned from having meetings at that location. Although appellants indicated that they are simply involved in community matters and may speak loudly, the undisputed evidence demonstrated that by 2016, things escalated to the point that security was hired. As indicated in appellee's exhibits, officers were hired to be present at the remaining 2016 meetings. After that, the meetings were moved to the police station due to security concerns.

{¶33} The undisputed evidence also indicated that a personal animus had developed between appellants and appellee. B.N. admitted that she was upset over drug activity allegations at her residence, and from that point, appellants filed the unsuccessful Board of Elections challenge to appellee's residency in his district. C.N. stated that he decided to "test" appellee's residence and filed a petition with the Board of Elections "just to see what would come out of it." It is undisputed that even after the challenge was rejected, appellants canvassed his neighborhood, in order to challenge his statement that he knows his neighbors and their children. Appellants also admitted that they went to his street on other occasions. At the next meeting, B.N. "got very mad" that the challenge had been rejected so she confronted appellee, and put her finger in his face. According to appellee, she threatened, "we're going to get you," and this caused him to fear physical harm. Although appellants denied confronting him a second time as he walked toward the exit, it is undisputed that the timing and location of their own

departure again coincided with appellee's location, and an officer intervened to escort appellee out of city hall.

{¶34} From this evidence, the trial court correctly concluded that appellee met his burden of proving conduct under R.C. 2903.211(A) by a preponderance of the evidence. This assigned error lacks merit.

## Manifest Weight

{¶35} In the second assigned error, appellants argue that the order granting the CSPO is against the manifest weight of the evidence.

{¶36} Under a manifest weight challenge, appellate courts are charged with

> "weigh[ing] the evidence and all reasonable inferences, consider[ing] the credibility of witnesses and determin[ing] whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."

*Vega* at ¶ 9, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.

{¶37} Here, the evidence demonstrated that appellants acted in a pattern of activity knowingly designed to threaten appellee or cause him mental distress. The record demonstrates that beginning in 2014, appellants' behavior at the public meetings, and behavior toward appellee eventually led to the hiring of security. According to appellee, they blurted things out with reference to him and "walked up on him in a very threatening way," and got in his personal space. At a meeting at the Sight Center in 2016, appellants were part of a group that was so disruptive that the city was banned from further meetings

at that location. Appellants maintained that they are simply involved in community matters and may speak loudly, but the undisputed evidence demonstrated that by 2016, conditions escalated to the point that the meetings were moved to the police station due to security concerns.

{¶38} The undisputed evidence also indicated that a personal animus had developed between the parties. C.N. stated that he decided to "test" appellee's residency, so he filed a petition with the Board of Elections "just to see what would come out of it." Appellants admitted to going to appellee's neighborhood in connection with this challenge. Additionally, after they lost the residency challenge, they canvassed his neighborhood, in order to challenge his statement that he knew his neighbors and their children. At the next meeting, B.N. "got very mad," so she confronted T.D., and put her finger in his face. According to appellee, she threatened that "we're going to get you," and this caused him to fear physical harm. Immediately after this confrontation, appellants were again in close proximity to appellee as he attempted to depart, and he had to be escorted from the building by a police officer.

{¶39} From the foregoing, the trial court's order granting the CSPO is not against the manifest weight of the evidence.

## Relief from Judgment

{¶40} In the third assigned error, appellants argue that the trial court erred in denying their motion for relief from judgment

**{¶41}** Where the moving party demonstrates that the original circumstances have materially changed and it is no longer equitable for the order to continue, a trial court may modify or vacate a CSPO. *Sheerer v. Billak*, 8th Dist. Cuyahoga No. 104879, 2017-Ohio-1556, ¶ 11; *Cipriani v. Ehlert*, 8th Dist. Cuyahoga No. 103767, 2016-Ohio-5840, ¶ 7; *Jones v. Hunter*, 11th Dist. Portage No. 2008-P-0015, 2009-Ohio-917, ¶ 12 (stating that although there is no section of R.C. 2903.214 that provides for a modification of a CSPO, a trial court may review an order made under this statute). On appeal, we review for an abuse of discretion. *Reising v. Reising*, 8th Dist. Cuyahoga No. 104864, 2017-Ohio-2859, ¶ 9; *Delaine v. Smith*, 8th Dist. Cuyahoga No. 103860, 2016-Ohio-5250, ¶ 16, citing *Hayberg v. Tamburello*, 5th Dist. Tuscarawas No. 2013 AP 02 0011, 2013-Ohio-3451.

**{¶42}** Similarly, we review a trial court's decision to grant or deny a Civ.R. 60(B) motion for an abuse of discretion. *Rose Chevrolet, Inc. v. Adams*, 36 Ohio St.3d 17, 20, 520 N.E.2d 564 (1988). When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993).

**{¶43}** In order to prevail on a Civ.R. 60(B) motion to vacate judgment, the motion must contain operative facts demonstrating three things: (1) the motion is timely, (2) the movant is entitled to relief under at least one of the grounds set forth in the rule, and (3) the movant has a meritorious claim or defense should the motion be granted. *GTE Automatic Elec. v. ARC Industries,* 47 Ohio St.2d 146, 150, 351 N.E.2d 113 (1976);

*Benesch v. Action Software, Inc.*, 8th Dist. Cuyahoga No. 91708, 2009-Ohio-1617, ¶ 22. If any of the three requirements are not met, the motion should be denied. *Rose Chevrolet, Inc. v. Adams*, 36 Ohio St.3d 17, 20, 520 N.E.2d 564 (1988).

{¶44} In this matter, we find no abuse of discretion in connection with the denial of the motion for relief from judgment. First, we note that there was no evidence to show, and B.N. and C.N. did not argue, that the original circumstances have materially changed or that it was no longer equitable for the order to continue. Rather, appellants filed an unsupported motion. Secondly, under Civ.R. 60(B), there are no allegations of operative facts that show that relief is warranted.

{¶45} With regard to appellants' assertion that First Amendment rights had been violated, we note that the relevant determination is whether enforcing the CSPO is necessary to achieve the overriding interest of protecting the safety of the person protected by the order, and is narrowly tailored to serve that interest. *State ex rel. Livingston v. Lanzinger*, 6th Dist. Lucas No. L-16-1281, 2017 Ohio App. LEXIS 669 (Feb. 14, 2017). In *Rosen v. Chesler,* 9th Dist. Lorain No. 08CA009419, 2009-Ohio-3163, the court held that modification of the 500 feet restriction safeguarded this concern. Likewise, we conclude that the trial court erred in failing to grant the modification proposed by appellants that would place the restriction at 50 feet.

{¶46} Finally, we recognize that a public official may expect to encounter criticism during meetings as evidence of our democracy in action. However, there are limits that must be recognized where the elements of R.C. 2903.211 are established. We also

recognize that after appellants' relationship with appellee soured, they began working for his opponent. We take judicial notice of the fact that appellee ultimately lost his position. In our view, these efforts of working within the political process presented perhaps the most appropriate manner for dealing with the issues that arose between the parties as opposed to acting in a menacing way.

{¶47} The third assigned error is well taken only as it applies to the 500- foot restriction.

{¶48} The order of the trial court is modified to indicate that appellants shall not be present within 50 feet of appellee, and as so modified, it is affirmed in all other respects.

{¶49} Judgment affirmed as modified.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS;
TIM McCORMACK, P.J., DISSENTS WITH
ATTACHED DISSENTING OPINION

TIM McCORMACK, P.J., DISSENTING:

{¶50} Our foundational documents, the United States and Ohio Constitutions, in their initial paragraphs, contain language that emphatically preserve the inherent right of U.S. citizens "peaceably to assemble, and to petition the Government for a redress of grievances." (U.S. Constitution.) Often those foundational protections actually touch down upon our community's sidewalks.

{¶51} We have before us an unseemly dispute, centered in one of Cleveland's historic neighborhoods, that very directly tests the limits of the constitutions' protection of right of assembly and in this matter to "petition the Government for a redress of grievances."

{¶52} The history of this neighborhood-centered dispute reflects community relationships that grew more noxious and toxic over a recent several-year period. The carefully written majority opinion fully documents the several nonphysical disagreements that are at the center of this legal action. This neighborhood conflict led one of the parties, an elected Cleveland city councilman, to seek a civil stalking protection order against two long-time resident citizens who live in the city ward that the councilman represented.

{¶53} The trial court found that the preponderance of the evidence met the elements of the Ohio law and granted a protective order mandating that the two activist citizens must remain at least 500 feet away from the councilman at all times. The

citizens appealed the trial court ruling to this court, asserting that their First Amendment rights of assembly and to petition their government have been unconstitutionally infringed. I agree with the appellants' argument and would dissolve the court order because it violates one of our most essential tenets of the American form of democracy.

{¶54} There is no question that the relationship between the parties and their discourse had deteriorated to a full-time confrontational approach. They did not like each other, and their mutual objectives were to civically overcome their adversaries. Unlike the conclusion of the trial court, I do not find the evidence proves physical harm was intended or likely. Nor would I find that "mental distress" as envisioned by the statute was proven. This dispute was all about robust urban politics. It was not, at its heart, a strictly personal threatening vendetta.

{¶55} As Americans, we mostly resolve our policy differences by casting ballots. Rarely do people become so exasperated with each other that they sense no way out but physical conflict. Elected officials want to be liked, respected, and successful at election time. That is not always possible. In times of high stress, with much at stake, citizens and their elected officials can experience the pains of change. Having citizens in close quarters tell you as an elected official that you have failed and will be replaced is stressful, frightening, and almost never what officials want to hear. It is through the brilliance of our system that differences can be tested against each other systemically rather than through violent conflict.

**{¶56}** I find it deeply troubling should this precedent stand. Yes, relations in this Cleveland ward are very strained. Civility is sorely tested. Absent a much clearer palpable threat, this order should be dissolved. Respectfully, I dissent.